## Case No. 15,967.

### UNITED STATES v. OPEN BOAT.

[5 Mason, 120.] 1

Circuit Court, D. Maine. Oct. Term, 1828. 2

Nonintercourse Laws — Open Boats — Vessels Owned by Domiciled British Subjects.

1. An open boat is not a ship or vessel within the purview of the statutes of 1820, c. 122 [3

1 [Reported by William P. Mason, Esq.]
2 [Affirming Case No. 10,549.]

Stat. 602], and 1823, c. 150 [3 Story's Laws, 1893 (3 Stat. 740, c. 22)], which prohibit commercial intercourse from the British colonies.
[Followed in U. S. v. Open Boat, Case No. 15,968.]

2. It seems, that, notwithstanding those statutes, open British boats may visit the United States, if not destined for trade.

3. British ships or vessels excluded from our ports by those statutes, are such as are owned by British subjects, having a British domicil, and sailing under the British flag. and not ships or vessels owned by British subjects domiciled in the United States.

[Appeal from the district court of the United States for the district of Maine.]

Libel of seizure for violation of the navigation and intercourse acts of 15th of May, 1820, c. 122, and of 1st of March, 1823, .c. 150 [3 Story's Laws, 1893 (3 Stat. 740, c. 22)] . against an open boat and her tackle and lading. The information alleged, (1) that this was a boat or vessel, owned wholly. or in part, by British subjects, and that she came and arrived by sea, from some part of the province of New Brunswick. within the port of Eastport; (2) that sundry goods. not of the growth and manufacture of the United States, comprising the boat load, were shipped and waterborne on the waters of the Bay of Passamaquoddy, for the purpose of being exported into New Brunswick in said boat, &c. not being a vessel of the United States. The facts, as proved, were as follows. The boat was under five tons in burthen, and was without a deck, and had on board, at the time of the seizure, 28 barrels of tar and pitch, with which she was bound from Eastport to St. Andrews, in New Brunswick. She had no custom-house papers on board at the time of the seizure, and it did not appear, that such papers had at any time been taken out for her. She was owned by British born subjects, who, with their families, had resided and been domiciled at Eastport for several years; and her home was admitted to be at Eastport. The goods on board were claimed by Joseph C. Noyes, a citizen of the United States, residing at Eastport. [The district court decreed a restoration of the goods. Case No. 10,549.]

Mr. Shepley. U. S. Dist. Atty.

The first inquiry is, whether this boat is included within the class of vessels excluded from the United States by the act of May 15, 1820. The word "vessel," as applied to maritime affairs, is understood to mean any vehicle used for transportation on the water; and if the word is used in the act according to its common acceptation, the act clearly excludes boats owned by British subjects, from our waters. And if such is the sense in which the word is used in the laws of the United States generally, it may safely be concluded to have been so used in this act. In the first registry act of September 1, 1789, c. 11 (Brozen's Ed.) [1 Stat. 55], the language used is, "ship or vessel," to designate all

water-craft; and when it is intended to exclude any of the small craft, a limitation is made by stating the tonnage. In section 22, it is provided, that "the master or owner of every vessel of less than twenty tons and not less than five tons"—"shall cause the name of such vessel to be painted," &c. In the coasting act of February 18, 1793, c. 52 [1 Story's Laws, 285 (1 Stat. 305, c. 8)], §§ 1, 4, 6, "ships or vessels," of less than twenty tons, are spoken of; and in section 26, "ships or vessels" of more than five tons; and in the 37th section is a provision, that the act shall not extend to boats or lighters of a specific class, thereby implying, that it does extend to other boats and lighters. In the collection act of March 2, 1799, c. 128, § 92 [1 Story's Laws, 656 (1 Stat. 697, c. 22)], foreign merchandise is required to be imported on "ships or vessels" of less than thirty tons, except in certain districts, thereby implying, that such importation in those districts may be made in "ships or vessels" of less tonnage without limitation. In the act of July 29, 1813 [3 Stat. 49], granting "allowances to certain vessels employed in the fishery," section 5, "ship or vessel" is used, and the limitation established by the tonnage. In the 6th section, "boat or vessel" is used, and the limitation is made by the tonnage. And so in sections 7 and 8, "vessel" and "ship or vessel" are the terms used. It is believed the term "vessel" is used in the laws of the United States, as including all water-craft, and that a limitation is expressed where one is intended. Where the language of a statute is plain, courts will never look after the motives of the lawgiver, or the objects intended to be effected; they do so only where the language is obscure or contradictory, or where from some other cause the mind is left in doubt, whether the statute embraces the case. Believing that this statute is neither doubtful nor obscure, but that it determines clearly, that vessels of all classes from New Brunswick, owned by British subjects, are excluded from our waters under penalty of forfeiture; the propriety of arguing whether a particular class, to wit, boats, come within the evils intended to be remedied by the statute, is not admitted; but while it is not admitted, such an inquiry is not to be feared. The object of Great Britain seems to have been, to give to her own subjects the navigation and trade to her colonies in the West Indies. The object on our part, to counteract that policy and prevent the intended effect of it. The British, by excluding us from the West Indies, hoped to secure for themselves "the long voyage" from these provinces, or from our country to the West Indies. The United States hoped, by excluding all these provincial vessels from our ports, to operate as strongly against their navigation, as their own laws were calculated to operate in its favour. Whatever, therefore, would tend to depress and injure their shipping interest,

and to deprive them of the fruits they intended to reap, would be in furtherance of the policy of this government. Hence we should expect to find our government extending the exclusion as far as it might lawfully do. It could not extend the exclusion beyond the provincial vessels, without a violation of the commercial convention of 1815. And it has done what would be expected of it. It has not stopped at the exclusion of British West India vessels, but has excluded all her provincial vessels without discrimination. To limit the exclusion to a particular class of these vessels, would be doing less than this government had a right to do, and less than her counteracting policy required should be done. And just so far as a limitation of the exclusive system is made, so far the British shipping remains uninjured, in the enjoyment of the advantages intended to be extended to it by the British laws. If a distinction is to be made in the classes of vessels excluded, and not excluded, by what rule is the court to be guided in making it? What shall be the tonnage of those not excluded? Will the court look into a foreign statute book to fix this rule, and so make the rule change, as foreign legislation varies? Can any limitation be adopted, confining the operation of the statute to British subjects domiciled abroad? Such a construction would be contrary to our whole system of navigation as exhibited in the registry and coasting acts; and would give all the trade to British built vessels, changing only the domicil of the owners. Suppose at the passage of the act of 1820, amendments had been offered, limiting the act to vessels navigating according to the regulations of the British plantation trade; or to vessels documented as British vessels; or to vessels with decks; can one doubt that each of these propositions would have made a material alteration in the act, and would have required and received very grave deliberation before it had been adopted? "De minimis non curat lex" cannot be applied to the boat navigation; it would be out of place.

On what is believed to be another erroneous construction of the statute, is founded an objection to the sufficiency of the first allegation in the libel. The words "shall enter or attempt to enter" the ports of the United States, are supposed to mean something more than coming within those ports. It is not perceived what other meaning can be attached to them, unless they require an entry at the custom-house. Such a construction would make congress declare, that British vessels should be excluded from our ports, and yet might come within them and do as they pleased, if they would avoid the custom-house. On a careful examination of the act it will be perceived, that the coming "by sea" is applied to the vessels of Lower Canada only, and the reason of it is obvious; Lower Canada being the only place mentioned in the act where arrivals in any other mode, to any extent, could be expected.

In relation to the second allegation in the libel it may be remarked, that the exports by the act of March 1, 1823, § 5, are limited to "any vessel of the United States or any British vessel," navigated, as prescribed, to the enumerated ports. By the 6th section, the act "so far as the same shall apply" to the intercourse "in British vessels, shall cease to operate in their favour," on the president's issuing his proclamation,—and by the proclamation it has so far ceased to be operative, and no farther. The act, then, remains in force to require exports "in any vessel of the United States" to be made to the enumerated ports; and to prohibit exportation in vessels, not vessels of the United States, by confining the exports to vessels of the United States. To adopt any other construction, is to erase the words "in any vessel of the United States," and read the act as if those words had never had place in it. But why is there such language used in the other section, that the president's proclamation shall cause the act to cease so far as respects British vessels, if nothing was intended to be regulated but British vessels? Why was not the act in terms suspended entirely, if such was the intention? Why such pains-taking, in the language of the act, to exclude the very result now contended for, if nothing was intended by it? Although the policy of confining exports to our own vessels, and in those, to certain enumerated ports, may not be seen; the inquiry is not whether the policy is wise, but whether congress has so enacted. Judicial tribunals do not assume the responsibility of erasing certain parts of a statute, because the wisdom of its provisions is not seen. Great might be the alterations in statutes, if such a rule were adopted.

C. S. Davies, for claimant.

The navigation of the United States, in the sense in which it comes into view by international regulations, is defined by the early acts of congress. What shall be deemed vessels of the United States, is determined by the provisions of our registry and coasting laws; settling how they shall be constructed, documented, owned, and manned, to entitle them to privileges of that national description, and discriminating the rates of tonnage established in their favour against foreign vessels. The lowest scale of tonnage, coming within the description of vessels of the United States, in the terms of their navigation acts, is five tons. Nothing in the provisions of the act for regulating the coasting trade and fisheries (section 37) extends to any boat or lighter not masted, or not decked (open), employed in the harbour of any town or city. The colonial intercourse, sought for by the government of the United States, is not capable of being carried on in vessels of a description inferior to what are legally denominated "vessels of the United States," and against which the

measures of British legislation are directed. The act of 1820 is only pointed against British vessels arriving by sea. There is nothing in any of the respective provisions of Great Britain or the United States, that looks to a conflict of boat navigation. There has been no controversy on that subject; no measure for retaliation on our part existed in the English system. Such light boats are not recognized in the respective registry or enrolment acts, and navigation laws, of either power, more than birch canoes or timber rafts. They are not required to be built, owned, or navigated in any particular manner; they are not subject to tonnage duties; nor reached by any provisions of national policy. The allegation in the first article in the information certainly is, that this boat was a British vessel, within the meaning of the act of 1820. What sort of British vessel was contemplated by the policy of the acts of 1818 and 1820? The answer is, those that were protected and set apart, by the policy of the English navigation and plantation system, for the engrossment of the commercial intercourse between her American dependencies, and the United States. The act of 1818 touched, if I may so say, the very pupils of the British system. It bore immediately on British vessels, which had directly "cleared out" from, or circuitously touched at, any port or place in the British dominions, from which our navigation was excluded. It forbid their entering or attempting to enter the ports of the United States, under forfeiture of vessel and cargo. And every British vessel which should duly "enter" our ports, and take on board productions of the United States, was required to "give bond" (pursuing the pattern of the English plantation provision,—28 Geo. III. c. 6, § 3), also (act of navigation,—St. 12 Car. II. c. 18, § 19), to land them without any part of the British dominions from which our vessels were debarred by the British laws of navigation. There is nothing in all these provisions, that relates to the regulation of boats. The act of 1818 is defined to be a "non-intercourse, in British vessels, with ports closed, by British laws, against the vessels of the United States." Documents 19th Cong. (2d Sess. 1826) No. 2, p. 43; Letter of Mr. Adams to Mr. Rush, June 23, 1823. The supplementary act of 1820, was intended to arm and invigorate the act of 1818. It applied a special interdict to British vessels; vessels owned wholly or in part by British subjects; coming or arriving by sea from any part of the British dominions in this hemisphere. It prohibited their entry, or attempting to "enter," under pain of forfeiture, as before; and bonds were again required of British vessels duly entered, not to discharge articles of the produce of the United States shipped on board, for exportation, in any of the prohibited places. The 3d section prohibited importation into the United States from any of the foregoing

British dependencies, of any articles not produced therein, specially. This act established "a non-intercourse in British vessels with all the British American colonies, and a prohibition of all articles" except the produce of each colony respectively imported directly from itself. Documents of Congress, ut supra.

By the act of 1823, congress suspended the provisions of the acts of 1818 and 1820, in respect to certain British colonial and provincial ports, and authorized importation in certain British vessels, coming directly therefrom, of colonial produce, on one condition, that the same might be exported therefrom to this country, on equal terms, in vessels of the United States, the British vessels thereby admitted "being navigated by a master and three fourths of the mariners, at least, British subjects." The next section (section 3) provided for equalizing the duties on tonnage. The act of 1823, was apparently designed as a counterpart to St. 3 Geo. IV. c. 44 (1822). That statute allowed American built vessels, lawfully navigated, to import certain goods directly to the West Indies, and export colonial produce in their own bottoms. The trade authorized by this statute (like that secured by the commercial convention to be carried on with the East Indies) was to be conducted in ships built in the United States, whereof the master and three fourths of the mariners, were American. This act established the free ports enumerated in our act of 1823, and authorized the importation of certain specified articles, either in British built vessels, owned and navigated according to law, or in vessels of the build and ownership of the country, in which the articles imported had their origin, and authorized exportation, in the same description of vessels, direct to the country where the vessel belongs. By St. 3 Geo. IV. c. 45, the national commerce of the colonies, in exports and imports, is limited to British vessels, owned and navigated according to law The act of congress of 1823, corresponding to these provisions (section 5), enacted, that it should be lawful to export to any enumerated British port, in any vessel of the United States, or in any British vessel, navigated as required by the 2d section, and having come directly from any of the enumerated ports, articles of the growth, produce, or manufacture of the United States, or imported therein, under the restriction therein provided. The proviso to the section relates exclusively to exportation in British vessels, and requires, that when exported in any such British vessel, bond shall be taken by the collector of the port, at which she shall have entered, for the due landing of the goods at the enumerated port, for which she shall have cleared out. The bond was to be given before shipment. No goods were allowed to be exported to any other than one of the enumerated ports, nor to be shipped on board any British vessel, except one coming direct from such port. And it was further enacted by the proviso, that "in case any such articles should be shipped or waterborne for the purpose of being exported contrary to the act, they should be forfeited." This act of 1823, was intended to meet and reciprocate the act of parliament of 3 Geo. IV. c. 44, establishing the free ports enumerated by our law. The regulations respecting exports and imports are understood to have been, in a legislative sense and measure, squared with the provisions of that act. The intercourse which was opened to our vessels in direct voyages to the free ports by the act of parliament, was opened also to British vessels, coming directly from, and returning directly to, the same ports, by the act of congress. British vessels, such as are privileged in the "trade and intercourse" before mentioned, were the subjects of this reciprocal measure; and the original retaliatory interdict was left to operate upon the same privileged vessels, either coming from, or going to, any other than one of the free and enumerated ports. And the previous interdict was further armed by the clause condemning goods either shipped, or waterborne, for the purpose of shipment, contrary to the force of this determined regulation. The whole measure seems to have had a final relation to the West India trade and intercourse; and the object appears to have been, to prevent exportation directly on board such British vessels, or indirectly and clandestinely by intermediate conveyance. British and American vessels, the respective objects of national protection, are thus brought into opposition by the principles and terms of the two corresponding acts; and the act of congress makes a special provision to prevent the liberty allowed to British vessels, from exceeding the measure granted to ours. The two acts of parliament and congress, taken together, constituted a sort of legislative convention, for the time being. Hence the language of the 5th section of the act of 1823, that "it shall be lawful to export from the United States, directly to any of the British colonial ports enumerated, in any vessel of the United States, or in any British vessel navigated," as the 2d section prescribed, &c. The terms employed are mutual; but the power of the act does not operate on vessels of the United States. So far as our laws were concerned, our vessels were at liberty before; and the only obstruction was from British legislation. After this act of 1823, was passed, there was nothing else, besides the act of parliament, to limit our vessels to the free or enumerated ports. Our act did not extend to prevent them from going to any other ports. In regard to them, viz. "vessels of the United States," its words had no legal meaning. The restrictive terms of the act of 1823, apply emphatically to British vessels. "being navigated by a master and three fourths at least, of the mariners, British subjects." Its force is ex-

pended on them. The prohibition is not put upon export. The qualification or disqualification, is only fixed upon the character and quality of the carrier. The prohibition does not extend beyond the class of vessels, that were privileged by Great Britain.

The inference, which the attorney for the government is understood to draw from the evidence in this case, is that the boat was going to St. Andrews, which was one of the enumerated ports; and to which it would have been lawful, under the act, to export in a British vessel, coming directly from that port. And the employment of the boat is contended, by the attorney, to have been between Eastport and St. Andrews. This is supposition,—but if the defence rested on that point, there is no positive proof of that fact (viz. arriving from St. Andrews), in favour of the boat. But the operation of the act is annulled by the contingency provided for in the 6th section; the trade and intercourse between the United States and the British colonial ports having been subsequently prohibited by a British order in council, and the provisions of that act thereupon ceasing to operate in favour of British vessels, so far as it extended to them, as announced by the president's proclamation of 17th March, 1827; and the acts of 1818 and 1820 are thereby revived in full force. That the act of 1823 was thereby in effect repealed, was decided by the district judge in the case of The Atlantic (Dec. Term, 1827) [Case No. 621]. Erasing from the act the regulation in regard to British vessels, it is emphatically asked, what is left? The idea of an implied prohibition, a penalty by implication, raised constructively from the mention of "vessels of the United States," in the terms of the act, will not stand the test of legal principles. Although within the permissive words of the act, there was nothing within the terms of the prohibition but British vessels of the privileged class; nor is there anything else upon which they can act. It may be very true, that the present boat was not a proper "vessel of the United States;" but there can be no pretence for considering it a British vessel within the contemplation and meaning of the act; and although it be not the one, it is no matter, as long as it be not the other. The allegation, that this was not "a vessel of the United States," may be, technically, true enough, but it draws no consequence after it; but it will be difficult to sustain the allegation of its being a British vessel, to bring it within the act of 1820. It may be granted, that the persons represented as owners do not come within the requirements of our registry act. Neither is it a British built, owned, and navigated vessel, within the intendment of the act of 1820. The boat does not come within the scope, policy, and provisions of the act in reference to entry, bonding, tonnage. It is not a vessel "coming and arriving by sea within the sense of the statute." The allegation in the first article of

the information is defective. It does not state any entry, or attempt to enter. The coming and arriving by sea do not constitute the offence. It is only a sort of inducement to its taking place, or more properly, perhaps, an indication of its character. The vessel so coming and arriving, being British, is excluded. It is the vessel entering or attempting to enter, that is forfeited; and the language of the act has reference only to the class of vessels capable of coming to entry. It is submitted, therefore, with great deference, that a decree of forfeiture cannot be sustained on either allegation. It is not questioned that such a boat, in proceeding to discharge its lading on the opposite shore, might come in contact with some law there established, to prevent importation in other than their own privileged shipping; but the exportation supposed to be intended in the present case, was an American enterprize entirely.

STORY, Circuit Justice. This is a libel of seizure founded on the acts, prohibiting commercial intercourse with the British colonial possessions, of the fifteenth of May, 1820, [3 Story's Laws, p. 1800 (3 Stat. 602, c. 122)], and the first of March, 1823, c. 150 [3 Story's Laws, 1893 (3 Stat. 740, c. 22)], as put into operation by the president's proclamation of the 17th of March, 1827. The questions raised in the case depend upon the true construction of these acts, and upon the conformity of the libel thereto, so as to present the point of forfeiture. The act of 1820 provides, that "after the 30th of September, then next, the ports of the United States shall be and remain closed against every vessel, owned wholly, or in part, by a subject or subjects of his Britannic majesty, coming or arriving by sea from any port or place in the province of Lower Canada, or coming or arriving from any port or place in the province of New Brunswick," &c. And it then proceeds to declare, that "every such vessel so excluded from the ports of the United States, that shall enter or attempt to enter the same, in violation of this act, shall, with the cargo on board such vessel, be forfeited to the United States."

The first remark, which I would make on this clause is, that it inflicts no forfeiture upon an excluded vessel, unless she enters, or attempts to enter some port of the United States; and it is, therefore, necessary that the libel should, in substance, contain an allegation of such entry, or attempt, before the court can pronounce a decree of condemnation, however clearly the facts may be made out. Now, the first count in the libel, which alone touches this statute, contains no such allegation. It merely affirms, that "the vessel or boat aforesaid was a vessel, owned wholly or in part by a subject or subjects of his Britannic majesty, and came and arrived by sea from some port or place in the province of New Brunswick, to the at-

torney unknown, within the port of Eastport aforesaid, contrary to the form of the statutes," &c. This is not an allegation in strict conformity with the words of the statute. The words "arrive" and "enter" are not always synonymous, and there certainly may be an arrival, without an actual entry, or an attempt to enter. Perhaps an arrival within a port, cannot be without an entry into the port. But still, it seems to me, that courts of law are not to inflict forfeitures, without the substantial phrases of the statute being used. And I am by no means sure, that the court would be warranted in giving judgment, where the words departed so widely from those of the statute. It would seem inconsistent with the rules usually adopted in the administration of penal laws. This point, however, is less important, because the libel is open to amendment; though the strong inclination of my opinion is, that without an amendment no condemnation could be pronounced, if the case were ever so clearly in favour of the government. The coming or arriving by sea is confined, by the immediately succeeding words, to Lower Canada, and any coming or arriving is prohibited from New Brunswick, whether by sea or otherwise. In this respect, I adopt the criticism of the district attorney as well founded. This informality in the allegation is no otherwise important, than that it ties up the case to narrower evidence, than the act itself requires.

The important question however is, whether the facts present a case within the real scope and operation of the statute. The facts are these. The owners of the boat are, and have been for several years inhabitants of Eastport, and have with their families a bonâ fide domicil there. The boat itself is less than five tons in burthen, is open and without any deck, and her home also is admitted to be Eastport. The owners are British born subjects, and have not, so far as any evidence exists in the record, changed their national allegiance. At the time of the seizure, the boat had on board 28 barrels of tar and pitch, and was bound with them from Eastport to St. Andrews, in New Brunswick. She had no custom-house papers on board, and none appear to have been taken out at any time for her. There is no proof that she ever came from New Brunswick and entered, or attempted to enter, any port of the United States. Strictly speaking, then, the facts do not, upon this general view, come up to a case of forfeiture. The intention of the parties, however, is not, as I understand it, to place the cause on this ground. Their wish is to settle a general question of great concern to the navigation with small craft, in that part of the country. And as the point has been fully argued, and a decision may save much future litigation, I am not indisposed to meet it upon the merits.

The question is, whether the navigation from the province of New Brunswick to a port of the United States by an open boat, owned as the present is, is interdicted by the act of 1820. The libel does not charge, that she was employed in trade; and therefore, if the interdiction applies at all, it applies (as has been very correctly remarked by the district judge) as well to cases, where the boat is employed as a ferry boat, or to make a visit, as to cases, where the object is the transportation of merchandise. The argument of the district attorney is, that the boat falls within the general description of the statutes, and is a "vessel" within its terms and meaning; and that she is owned "by a subject or subjects of his Britannic majesty." And if so, she is excluded from entry into our ports. There can be no doubt, that in a general sense a boat is a vessel, for it is a "vehicle in which men or goods are carried on the water," which is one of the definitions of a "vessel" given in our lexicographies; and one of the definitions of a "boat," given in like manner, is, that it is "a vessel to pass the water in," or "a ship of a small size." In a nautical sense, it more usually designates an open vessel, without decks. Whether the word is used in the one sense or the other in a particular statute, must depend upon the context and objects of the statute itself, which may and often do narrow down the general import to specific classes of cases. The object of the act of 1818, c. 65 [3 Story's Laws, 1677 (3 Stat. 432, c. 70)], to which the act of 1820 is an explanatory supplement, is to exclude British navigation from our ports, which should come from any of the British colonies, which were closed against the navigation of the United States. Both acts were in their nature retaliatory; and the subsequent acts of 1822, c. 56 [3 Stat. 681], and of 1823, c. 150 [3 Story's Laws, 1893 (3 Stat. 740, c. 22)], confirm this view in the most ample manner. The doctrine of reciprocity lies at the bottom of all of them, and this principally in regard to the islands and colonies in the West Indies. That the intention of the act of 1820 was to cut off trade and commerce in British ships from New Brunswick to the United States cannot be doubted; that it went farther, and meant to prohibit all intercourse by water with that province in any British craft, is not so clear. If the words of the act would cover such cases, it is by no means as certain, that the policy of the legislature reached to the same extent. It is well known, that the ordinary mode of communication between that province and northeastern frontier ports is by boat navigation; and there does not seem to be any ground to suppose that congress intended to prevent the common travel of visitors, or passengers, to and from that province. The second section of the act is manifestly confined to British vessels, which are allowed and required to enter at the custom-house in the course of trade. But boats

of the present description do not fall within this class. The third section applies to cases of the importation of goods from the colonies, and is necessarily confined to commercial intercourse. The same intention is still more completely demonstrated in the act of 1823, which suspends the acts of 1818 and 1820 as to certain colonial ports, and opens trade with them in British vessels. Every provision in this act looks to cases of trade and importation; and to vessels, which by our general laws are allowed to enter and clear at our custom-houses. By the general revenue collection act of 1799, c. 128, § 92 [1 Story's Laws, 656 (1 Stat. 697, c. 22)], no foreign dutiable goods are allowed to be imported from any foreign ports by sea in any vessel, foreign or domestic, of less than thirty tons burthen. And the navigation act of 1817, c. 204 [3 Story's Laws, 1622 (3 Stat. 351, c. 31)], is still more restrictive. I am not aware, that in any of our laws respecting shipping the word "vessel" is applied to any description of boats, like the present. The registry act (Acts 1792, c. 45 [1 Story's Laws, 268; 1 Stat. 287, c. 1]), invariably uses the words "ship or vessel," as descriptive of the class of shipping, which it includes. It contains no limitation by tonnage of the size of the ship or vessel; but the form of the certificate of registry (section 9) supposes, that such ship or vessel has a deck, mast, &c. And the regulations, prescribed by our laws, for ascertaining the tonnage of ships or vessels for the payment of tonnage duty, and for other purposes of admeasurement, refer to such only as have one or more decks. Acts 1799, c. 128, § 64 [1 Story's Laws, 630]. The fair inference deducible from these provisions is, that the registry act was not meant to apply to ships or vessels without any deck. In respect to the coasting trade and fisheries, the same phrase, "ship or vessel," is used in the act of 1793, c. 52 [1 Story's Laws, 285 (1 Stat. 305, c. 8)], for enrolling or licensing them for such business; but no ship or vessel less than five tons in burthen seems within the purview of the act. Sections 1, 4, 26. The form of enrolment, too, presupposes, that the ship or vessel has a deck, mast, &c; and her tonnage is to be ascertained in the same manner, as in case of registered ships. There is a provision also (section 3) that registered ships may be enrolled, and enrolled or licensed ships may be registered, which seems, by implication, to limit their sizes reciprocally to tonnage above five tons, and to such as have a deck or mast. This construction is fortified by the language of the 37th section, which declares, "that nothing in this act shall be construed to extend to any boat, or lighter, not being masted, or if masted, and not decked, employed in the harbour of any town or city." It is plain, from this clause, that boats without masts or decks were not allowed to be enrolled or licensed for the coasting trade or fisheries. And the fishing bounty is confined to "boats or vessels" of more than five tons burthen. See Acts 1813, c. 34, §§ 5, 6 [3 Stat. 49].

There are, also, provisions in our laws, which contemplate importations from foreign countries in vessels of a smaller description. But in such cases, the general term "vessel," is not alone employed, but a more specific description is added. Thus, by the 105th section of the act of 1799, c. 128 [1 Story's Laws, 661 (1 Stat. 702, c. 22)], importations are allowed on the northern and northwestern boundaries of the United States, "in vessels or boats of any burthen;" and the next section (section 106) goes on to provide, "that all vessels, boats, rafts, and carriages of what kind or nature soever, arriving in the district aforesaid, containing goods, &c. shall be reported to the collector," &c. A distinction between "boats" and "vessels" is here taken; and a distinction does, in fact, exist in common parlance and maritime usage. The term "vessel" is never, or at least very rarely, used to designate any watercraft without a deck; but the term "boat" is constantly used to designate such small vehicles of this nature, as are without a deck. In Mortimer's Commercial Dictionary, a "boat" is defined to be "a small open vessel, commonly wrought by oars." He says, that the term "ship" is "a general name for all large vessels." And it appears to me, that the general sense, in which the word "vessel" is used in our laws, is in contradistinction to an "open boat," and excluding the latter. Such is its meaning in the act of 1815, c. 246 [2 Story's Laws, 1515 (3 Stat. 231, c. 94)], where it is declared lawful "for any collector &c. to enter on board, search, and examine, any ship, vessel, boat, or raft," &c. See, also, Acts 1802, c. 45, § 8 [2 Stat. 182]. And when the word is found in our laws without any thing in the context to explain or enlarge its meaning, it appears to me a sound rule of interpretation to construe it as used in that sense, which is its most common sense in maritime usage. Especially ought it to receive such an interpretation, when it interferes with no known policy of the legislature, and a different course would involve general inconvenience. The strong inclination of my opinion, therefore, is, that open boats, like the present, even if British owned, if not employed in trade from the British colonies, are not within the scope of the act of 1820. But this case does not turn upon that point alone; and therefore I leave it for an absolute decision, until it forms the single point for judgment.

There is another question of more importance, at least to residents within the United States; and that is, whether this boat was, within the sense of the act of 1820, a vessel "owned wholly or in part by a subject or subjects of his Britannic majesty." It is certain, that our laws allows aliens to build ships in the United States, and confer upon them privileges, which are denied to ships built and owned in foreign countries. The

former are allowed to be recorded in the custom-house, and to receive a certificate thereof, and thereby are subjected to a less tonnage duty than the latter. See Acts 1792, c. 45, §§ 20–22, 24 [1 Story's Laws. 268 (1 Stat. 287, c. 1)]; Acts 1790, c. 57, § 1 [1 Story's Laws, 106 (1 Stat. 135, c. 30)]. It is as clear, that British subjects, domiciled in the United States, are entitled to hold boats of the same description as the present. And I know of no law, which prohibits them from plying between port and port of the United States, so that they are not employed in the coasting trade or fisheries. It does not appear to me reasonable to presume, that congress had any intention to interdict intercourse, except with vessels belonging to British subjects, who retained their national domicil and privileges. If, by the laws of France, British subjects, domiciled in France, might bonâ fide own ships, which would be entitled to the privileges of French shipping, a ship so owned, and bonâ fide bearing the French flag, would not seem to me excluded from commerce with this country by the act of 1820. Without entering into the consideration, how far it is necessary to constitute an excluded ship, that she should be owned and registered according to the British registry acts, I think the true interpretation of the act of 1820 is, that the words therein, "British subject or subjects," mean such subject or subjects as still retain their British domicil, and hold their vessels in the character of British subjects; and not such as have a domicil in the United States, and own vessels, which are protected by the laws of this country, and have their home bonâ fide here. The policy of the United States has not been to interfere with merchants domiciled here; but to exclude shipping sailing under the flag of protection of England; such shipping as, in the sense of the law of nations, would be deemed British shipping. By the law of nations, for all purposes of capture and prize, and national character, this boat would be deemed an American boat, because her domicil is American. My judgment, therefore, is, that upon the first count the case of forfeiture is not made out in point of fact, because this boat is not, in the sense of the act of 1820, owned, in whole or in part, by subjects of his Britannic majesty.

The second count in the libel is founded on the 5th section of the act of 1823, c. 150 [3 Story's Laws, 1893 (3 Stat. 740, c. 22)]. That act opens commercial intercourse and navigation with certain enumerated British colonial ports, and among others, with St. Johns and St. Andrews, in New Brunswick; and declares it lawful to import in any British vessel, coming directly from any of the British colonial ports enumerated in the act, which vessels are navigated by a master and three fourths of the mariners British subjects, any articles of the growth &c. of any of the said British colonies, the importation of which is not from elsewhere prohibited, and which may be exported from the same ports to the United States on equal terms in vessels belonging to the states. It prohibits importations in any other manner, or of any other kinds, from the same colonial ports. The 5th section then proceeds to provide, that it shall be lawful to export from the United States directly to the same colonial ports in any vessel of the United States, or in any British vessel, as above described, any article of the growth &c. of the United States, or any article legally imported therein, the exportation of which elsewhere shall not be prohibited by law &c. And in the close of the section it declares, "and in case any such articles shall be shipped or waterborne for the purpose of being exported contrary to this act, the same shall be forfeited," &c. This is the clause on which the second count of the libel is framed. It propounds, that at Eastport, "sundry goods &c. of the growth &c. of the United States, composing the lading of the open boat aforesaid, were shipped and waterborne in said boat, on the waters of the Bay of Passamaquoddy, in said district, for the purpose of being exported from said States to the province of New Brunswick, in the boat or vessel aforesaid, the said boat or vessel then and there not being a vessel of the United States," &c. The 6th section of the act provides, "that this act &c. shall remain in force as long as the enumerated British colonial ports shall be open to the admission of vessels of the United States, conformably to the provisions of the British act of parliament, of the 24th of June, 1822. St. 3 Geo. IV. c. 44. But if at any time the trade and intercourse between the United States and all or any of the enumerated ports, authorized by the said act of parliament, shall be prohibited by a British order in council, or by act of parliament, then, from the day of the date of such order in council, or act of parliament, or from the time the same shall commence to be in force, proclamation to that effect having been made by the president of the United States, each and every provision of this act, so far as the same shall apply to the intercourse between the United States and the enumerated colonial ports, in British vessels, shall cease to operate in their favour; and each and every provision of the act," of 1818 and 1820, "shall revive and be in full force." The president made his proclamation according to this provision, on the 17th of March, 1827, and thus the acts of 1818 and 1820 were effectively revived. The true interpretation of this 6th section of the act has been matter of considerable argument at the bar. Is it, in the given case of the occlusion of the enumerated British colonial ports, virtually repealed in all its provisions, as to intercourse and trade with them, as the introductory clause seems to intend? Or is it repealed only as to intercourse and trade in British vessels, leaving the intercourse and trade in vessels of the United States under the regulation of the 5th section, as a

substantive and existing enactment; as the latter clause of the 6th section seems to intimate? The latter is the construction contended for by the district attorney, and on which the second count rests; the former is maintained by the counsel for the claimant.

The act of 1818 contains no provisions excluding trade, either by way of importation into the United States, or exportation from the United States, except in British vessels. Not a word is said respecting the vessels of the United States, or of any other foreign country, except Great Britain. The 1st and 2d sections of the act of 1820 are limited in the same manner. The 3d section prohibits the importation of any· goods, &c. from the province of Nova Scotia, the province of New Brunswick, the islands of Cape Breton, St. Johns, Newfoundland, or their respective dependencies, from the Bermuda islands, the Bahama islands, the islands called Caicos, or the British possessions in the West Indies, or on the continent of America, south of the southern boundary of the United States, except such goods &c. as are the growth &c. of such provinces, islands, and possessions, where the same shall be laden, and from whence they shall be directly imported into the United States. Nothing is said as to exportations from the United States of any goods whatsoever in vessels, not British. The main object of the act of 1823 was to open the intercourse and trade with certain enumerated ports in those prohibited colonial possessions, upon the principles of reciprocity held out by the act of 3 Geo. IV. c. 44. The first four. sections respect importations solely in British vessels. In the 5th section, for the first time, occurs any provision relating to exports, and there the phrase is (as has been already stated), it shall be lawful to export from the United States &c. in any vessel of the United States, or in any British vessel, &c. The first remark. that is called for by this posture of our legislation is. that as to British vessels. the whole intercourse and trade, provided for by the act of 1823. is completely suspended, and the exclusion of them, by the acts of 1818 and 1820, entirely revived. Thus the retaliatory system is put into complete operation; and that, which alone seemed within the legislative intention, the exclusion of British ships coming from, or going to. ports, where American ships were excluded, universally prohibited. The next remark is, that no legislative intention is any where avowed to interdict trade or intercourse in American vessels to or from any colonial ports. The next remark is, that though the 5th section of the act of 1823, contains an affirmative clause, that it shall be lawful to export from the United States to the enumerated ports, in any vessel of the United States, any goods &c.; yet there is no prohibitory clause, declaring any such exportation in any vessels, not of the United States, and not British,

unlawful. Now, upon general principles of interpretation. no prohibition can be implied from merely affirmative words. The affirmative words may repeal or suspend a prohibition theretofore created, but per se they cannot create one. The forfeiture in the last clause of the 5th section applies only to cases, where articles shall be shipped or waterborne, for the purpose of being exported, "contrary to the provisions of the act." To inflict it, therefore, it must be established, that some prohibition exists in the act, which has been violated. Where is the prohibition of such exportation in vessels not British, and not strictly vessels of the United States in the sense of the registry act? None such has been pointed out; and if it had existed. it would not have escaped the scrutinizing sagacity of the district attorney. Assuming. then, that the 5th section, as to vessels of the United States, remains in full force, it is merely affirmative; there was no antecedent prohibition of exportation other than in British vessels; the present boat is not, in the sense of the act. such a British vessel; and consequently the second count falls for want of sufficient facts to maintain its vital averments.

The decree of the district court must be affirmed and restitution accordingly.